## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| B.H., an individual, | ) |
| | ) Case No.: 3:19-cv-03442 |
| Plaintiff, | ) |
| | ) |
| vs. | ) **FIRST AMENDED COMPLAINT FOR** |
| | ) **DAMAGES:** |
| Choice Hotels International, Inc., | ) |
| | ) |
| | ) |
| Defendant. | ) **DEMAND FOR JURY TRIAL** |
| | ) |
| | ) |
| | ) |
| | ) |

## COMPLAINT

Plaintiff B.H., by and through her undersigned counsel, respectfully submits her complaint for damages and makes the following averments.

## INTRODUCTION

1. For years, sex trafficking ventures have openly operated in and out of Choice Hotels International, Inc.'s hotels throughout the United States. Choice Hotels International, Inc. ("Choice") and their brand hotels remain willfully and negligently blind to the criminal misconduct in the name of and to continue earning a profit from sex trafficking, including the trafficking of Plaintiff, B.H. ("Plaintiff").

2. Choice knew, and should have known, for more than a decade that sex trafficking repeatedly occurs under their brand flag.

3. Choice failed to take timely and effective measures to thwart sex trafficking at their brand hotels. Instead, Choice ignored open and obvious signs and presence of sex

trafficking at their brand hotels and derived enormous profit from rooms rented and used for this specific purpose.

4. Plaintiff brings this civil action for damages as a victim under the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA") and South Carolina law.

5. Choice, in violation of 18 U.S.C. § 1595, knowingly benefited from facilitating a venture that they knew, or at the very least should have known, to be engaging in sex trafficking in violation of 18 U.S.C. § 1591(a).

6. Plaintiff was first trafficked at the age of nineteen (19) in Columbia, South Carolina.

7. In 2013, Plaintiff met her trafficker at a club where the two exchanged numbers. After going on a date with her trafficker, Plaintiff and her trafficker went to the Quality Inn® Fort Jackson Maingate ("Quality Inn®") located at 7251 Garners Ferry Road, Columbia, South Carolina 29209 where she was met by two other accomplices, forcibly raped and held at the hotel for days to engage in commercial sex while Choice profited in the rental of the room where Plaintiff sexually serviced paying strangers.

8. During this time, Plaintiff endured brutal physical assaults, psychological torment, verbal abuse, and false imprisonment at the Quality Inn®, a Choice brand hotel. She was forced against her will, physically tortured and sexually exploited under such duress at the Quality Inn®, a Choice brand hotel.

9. As a direct and proximate result of Choice's consistent refusals to prevent human trafficking for commercial sex on their brand hotel properties, Plaintiff was trafficked, sexually exploited, and repeatedly victimized at the Quality Inn®, a Choice brand hotel.

10. Plaintiff brings this action pursuant to the TVPRA, 18 U.S.C. § 1595, against Choice who enabled, harbored, held, facilitated, and financially benefited from sex trafficking ventures in which Plaintiff was trafficked for the purpose of commercial sex, sexually exploited, and brutally victimized in violation of 18 U.S.C. § 1591(a).

11. Choice knowingly profited from sex trafficking ventures that compelled and sustained Plaintiff in sexual servitude and are, therein, liable for the injuries inflicted upon Plaintiff by her traffickers due to their marked failure as innkeepers to exercise diligence consistent with a duty of care, let alone a heightened duty of care. Diligence that would have led Choice to discover the horrific acts that were being committed at their brand hotel. Thus, Choice conspired, enabled, and otherwise worked together in the abuse and exploitation of Plaintiff in keeping her invisible.

## **PARTIES**

12. Plaintiff, B.H., having moved to proceed anonymously,[1] and thus herein identified by her initials B.H., was sold for commercial sex in Columbia, South Carolina. Plaintiff is a victim of trafficking pursuant to 22 U.S.C. § 7102(15) and 18 U.S.C. § 1950, and a victim of a "severe form of trafficking" as it is defined under 22 U.S.C § 7102(14). Plaintiff is a resident of the State of South Carolina, Richland County.

13. Defendant Choice Hotels International, Inc. is a Delaware corporation with its principle place of business in Rockville, Maryland. Choice is a hospitality company that, at the time of the incidents alleged herein, directly and through its agents, affiliates, and

---

[1] Contemporaneously with the Complaint [ECF No. 1], Plaintiff B.H. filed, pursuant to a Motion to Permit Plaintiff to Proceed Anonymously [ECF No. 3] as Plaintiff based upon the nature of the allegations in the instant Complaint, which are of an inherently intimate and personal nature. The Motion is pending. Undersigned Counsel will provide her identity to Counsel for the Choice upon proper entry of a Protective Order.

subsidiaries, offered public lodging services at the Quality Inn® Fort Jackson Maingate in Columbia, South Carolina under its Quality Inn® brand:

    a. Quality Inn® is a Choice brand hotel.

    b. As a hotel operator, Choice controls the training and policies for its brand hotels, including the Quality Inn®.

    c. Choice maintains that it considers guest safety and security important, and requires the hotels in its portfolio to comply with Choice brand standards and all local, state, and federal laws.[2]

    d. Through its relationship with the staff at the Quality Inn® and the hotel guest trafficker who trafficked Plaintiff at the Quality Inn®, Choice knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known to engage in sex trafficking.

    e. Choice receive a percentage of the gross room revenue from the money generated by the operations of all Quality Inn® hotels, including a percentage of the rate charged on the rate charged for the rooms in which Plaintiff was trafficked.

    f. Choice owns, supervises, and/or operates the Quality Inn® located at 7251 Garners Ferry Road, Columbia, South Carolina 29209 under its Quality Inn® brand flag.

    g. Choice is subject to the jurisdiction of this Court because it regularly transacts business in South Carolina, operates dozens of hotels in South Carolina including the Quality Inn®, contracts to supply services in

---

[2] https://www.choicehotels.com/about/responsibility/human-rights-policy.

South Carolina, caused indivisible injuries to Plaintiff in South Carolina, and knowingly profited from an illegal sex trafficking venture at the Quality Inn® Fort Jackson Maingate located at 7251 Garners Ferry Road, Columbia, South Carolina 29209.

14. Whenever reference is made in this Complaint to any act, deed or conduct of Choice, the allegation is that Choice engaged in the act, deed or conduct by or through one or more of their officers, directors, agents, employees or representatives who was actively engaged in the management, direction, control, transaction of the ordinary business and affairs, and day-to-day operations of Choice brand hotels, including the Quality Inn®.

## JURISDICTION AND VENUE

15. This Honorable Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 because this action arises under the Constitution, laws, or treaties of the United States, based upon federal claims asserted pursuant to 18 U.S.C. § 1595.

16. This is a civil action alleging, *inter alia*, violations of 18 U.S.C. § 1595.

17. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as the state law claims are so related to Plaintiff's federal law claims that the claims form part of the same case or controversy.

18. Venue is proper within this District Court as this District Court is a judicial district where Choice is subject to personal jurisdiction in accordance with 28 U.S.C. § 1391(b)(2), as well as the South Carolina Long-Arm statute.

19. Venue is proper in this district pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action, including

Choice's misconduct and omissions, occurred in the judicial district where this action is brought.

20. Choice has consensually submitted to the jurisdiction South Carolina and have purposefully availed themselves of the privilege of conducting acts in South Carolina through Choice's dominion and control over their respective brand hotels with franchisor subsidiaries, franchisee subsidiaries and operating hotels, and day-to-day operations of the their brand hotels, and, thus, invoking the benefits and protections of the laws in South Carolina; South Carolina has an equally strong interest in protecting and assuring the safety of persons within its State.

21. Choice has consensually submitted to the jurisdiction South Carolina and have purposefully availed themselves of the privilege of conducting acts in South Carolina which is imputed through the conduct of franchisor subsidiaries, franchisee subsidiaries and operating hotels as a result of Choice's dominion and control over their respective brand hotels with franchisor subsidiaries, franchisee subsidiaries and operating hotels, and day-to-day operations of the their brand hotels, and, thus, invoking the benefits and protections of the laws in South Carolina; South Carolina has an equally strong interest in protecting and assuring the safety of persons within its State.

## SEX TRAFFICKING UNDER FEDERAL LAW

22. Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion." This definition combines the three elements of sex trafficking as a criminal offense: the act, the means, and the purpose.

6

23. While the complete definition of 'sex trafficking' is found in the TVPRA under 22 U.S.C. § 7102, and it is specifically prohibited under 18 U.S.C. § 1591, it is nevertheless a long-recognized and familiar atrocity.

24. Pursuant to 18 U.S.C. § 1591(a), all who knowingly provide or obtain commercial sex that was provided or obtained through force, fraud, and coercion are guilty of sex trafficking. This includes, at a minimum, both the 'traffickers' who recruit, harbor, transport, and provide individuals for forced commercial sex work and the buyers who obtain, solicit, and/or patronize forced commercial sex work. Both the 'traffickers' and buyers therefore trafficked Plaintiff and paid for rooms from which Choice profited.[3]

**FACTUAL ALLEGATIONS**

**A. HOSPITALITY INDUSTRY'S PARTICIPATION IN THE SEX TRAFFICKING INDUSTRY**

25. 75% of survivors responding to Polaris's survey reported coming into contact with hotels at some point during their exploitation… Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff." *See* The Polaris Project.[4]

26. Reports by The Polaris Project were received and reviewed by the executives, directors and managers of Choice.

27. Upon information and belief, other publically available information regarding trafficking in hotels was received and reviewed by Choice during the time period 2013 to 2019.

---

[3] While the 'pimps' or 'providers' are often referred to as the 'traffickers' and the purchasers are referenced as the 'Johns', 'tricks', or 'buyers' [and such nomenclature is used herein], under federal law **both** categories are 'traffickers'.

[4] *Recommendations for Hotels and Motels*, THE POLARIS PROJECT, https://polarisproject.org/hotels-motels- recommendations (last visited June 19, 2019).

28. Upon information and belief, between at least 2013 and 2019, Choice held meetings among their executives, directors and managers at which sex trafficking in hotels was discussed.

29. Upon information and belief, during at least the 2013 to 2019 time period, employees of Choice, including Choice's brand hotels, exchanged emails relating to sex trafficking in their brand hotels.

30. Choice played a crucial role in the sex trade, as do all hotels.[5]

31. Choice permitted anonymity to the buyers and non-traceability, making them ideal venues for sex traffickers to sell Plaintiff for sex.

32. Choice knew, or should have known, that the anonymity for buyers and non-traceability of their presence at its brand hotels made their hotels ideal venues that were indeed used for sex trafficking.

33. Choice, prior to the information being known publically, knew or should have known, that hotels are the top-reported venue where sex trafficking acts occur.[6]

34. Choice knew, or should have known, that trafficking was taking place from at least 2013 through 2019 at the Quality Inn®.

35. Choice knew that traffickers used its brand hotels, including the Quality Inn®, as hubs of operations. Inside, the victims, including Plaintiff, were harbored, raped, assaulted, and forced to service buyers who came to the hotel solely to purchase sex.

36. Choice knew, or should have known, that this is referred to as an "in call."

---

[5] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[6] *National Human Trafficking Hotline Statistics*, THE POLARIS PROJECT (2016), https://polarisproject.org/resources/2016-hotline statistics.

37. Choice knew, or should have known, that its brand hotels, including the Quality Inn®, are also venues of choice for buyers seeking a so-called "out call," wherein the buyer rents a hotel room and the trafficker delivers the victim to the buyer's room to complete the sordid transaction. Unsurprisingly, those on the demand side of this transaction (*i.e.* those purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels.

38. At all relevant times herein, Choice knew, or should have known, that sex trafficking in hotels was industry wide, included its brand hotels, and that a significant portion of all sex trafficking was taking place at hotels.[7]

39. Due to the complacency of Choice on addressing the issue, hotels are *the* venue of choice for sex trafficking.[8]

40. From at least 2013 through 2019 and to date, traffickers and buyers used and use hotel rooms, including those rented by Choice, due to Choice's failures and/or refusals to adopt, monitor and enforce companywide anti-trafficking policies from the corporate to the operating hotel level, train staff on what to look for and how to respond, and/or establish safe and secure reporting mechanisms for those at the point of sale.

41. Upon information and belief, prior to 2019, despite a duty to do so, Choice took inadequate measures to prevent sex trafficking at its brand hotels and profiting from sex trafficking at its brand hotels.

42. Upon information and belief, prior to 2019, Choice, through its employees, including executives, directors and managers, knowingly failed to take measures to

---

[7] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).
[8] *Hotels Initiative*, THE POLARIS PROJECT, https://polarisproject.org/initiatives/hotels (last visited June 19, 2019).

prevent sex trafficking at its brand hotels or profiting from sex trafficking at its brand hotels, including the Quality Inn®.

43. Upon information and belief, Choice, through their employees, including executives, directors and managers, decided not to take any measures to prevent sex trafficking at their brand hotels in order to conceal the fact that sex trafficking was occurring at their brand hotels.

44. Upon information and belief, each year, from at least 2013 until 2019, Choice received information indicating that sex trafficking had occurred at one of its brand hotels.

45. Upon information and belief, each year, from 2013 until 2019, Choice received information from media reports and/or law enforcement indicating that sex trafficking had occurred at one of its brand hotels.

46. At all relevant times, Choice had the financial resources to train hotel staff to identify the signs of sex trafficking.

47. At all relevant times, Choice had the authority to require that training of hotel staff to identify the signs of sex trafficking take place at its brand hotels, including at the Quality Inn®.

48. From check-in to check-out, there are a number of indicators that traffickers and their victims exhibit during their stay at a hotel. With proper training and the implementation of reasonable security measures, Choice could have prevented and identified regular sex trafficking under its respective brand flag.

49. Obvious signs of sex trafficking at Choice's brand hotels included: an excess of condoms in rooms, individuals carrying or flashing large amounts of cash, excessive

amounts of cash stored in the room, renting multiple rooms next door to each other, declining room service for several consecutive days, significant foot traffic in and out of room(s), men traveling with multiple women who appear unrelated, women known to be staying in rooms without leaving, women displaying physical injuries or signs of fear and anxiety, guests checking in with little or no luggage, hotel guests who prevent another individual from speaking for themselves, or a guest controlling another's identification documents.[9]

50. Hotel staff who have undergone training are more aware of sex trafficking when it happens and are more willing to report it than hotel staff who have not been trained.[10] For this reason, hospitality companies, including Choice, are obligated to adopt policies and procedures related to sex trafficking and to enforce these policies and procedures as brand standard through to the operating hotel level.

51. Hospitality companies, including Choice, can and should mandate that *all* staff working at *all* hotel properties across their brands complete sex trafficking training.[11]

52. In 2013, 18 U.S.C. § 1595 effectively required all companies with a peculiar proximity to human trafficking for commercial sex, including Choice, to use reasonable measures and conduct proactive audits to ensure that they were not profiting from what they *should know* are human trafficking ventures.

---

[9] *Id. See also*, Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, THE INSTITUTE TO ADDRESS CRIMINAL SEXUAL EXPLOITATION, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.

[10] Giavanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[11] Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, The Institute to Address Criminal Sexual Exploitation, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.

53. The hospitality industry, including Choice, have been cognizant of their role and responsibilities in the sex trafficking industry for years.

54. In 2012, an anti-trafficking coalition alerted Choice Hotels, Accor, Best Western, Hilton, Hyatt, Intercontinental Hotels Group, Marriott, Starwood, and Wyndham of the likelihood of sex trafficking during the London Olympics, and inquired about the companies anti-trafficking policies, while urging immediate action regarding trafficking.[12]

55. Further, nationwide campaigns that Choice was the target of, and subject to, recognized the issue of human trafficking for commercial sex in the hotel industry and the lack of internal policies to address the issue, and took initiative as early as 1997 with the United Nations Blue Heart Campaign and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[13] These efforts sought to educate both the public and private sectors on identifying and combating human trafficking for commercial sex, including the hospitality industry and both campaigns released online resources and toolkits publicly accessible to any entity concerned with human trafficking for commercial sex.[14]

56. The presence of sex trafficking and exploitation in hotels is an obvious occurrence and although unutilized, underutilized, or ineffectively utilized, numerous

---

[12] *Corporate Strategy to Address Human Trafficking: Investor Recommendations for London Olympic Sponsors and Hospitality Companies, Christian Brothers Investment Services*, CBIS, http://cbisonline.com/us/wp-content/uploads/sites/2/2012/09/FINAL_OlympicsReport_9_28.pdf.

[13] *DHS Blue Campaign Five Year Milestone*, DEPARTMENT OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

[14] *Human Trafficking and the Hospitality Industry*, DEPARTMENT OF HOMELAND SECURITY, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited June 19, 2019).

well-researched trainings and toolkits have been published for the hotel industry over the last decade to help hotel staff in every position to identify the signs.[15]

57. Choice has been aware of and monitored the anti-trafficking activities of the hospitality industry as a whole and that of specific competitors, including those discussed above for years.

58. For years, Choice has participated in meetings and discussions with competitors and others in the hospitality industry about the prevalence of human trafficking for commercial sex in its brand hotels and the most effective means in which that sex trafficking could be stopped.

59. Despite its knowledge of sex trafficking in its brand hotels and efforts undertaken or laid out by others to stop such trafficking, Choice did nothing to stop the sex trafficking at its hotels.

60. When Choice eventually began to adopt policies and public statements to combat sex trafficking, it did so in appearance only but utterly lacking in substance.

61. Hospitality companies, including Choice, have both the power and responsibility to make sex trafficking difficult for the offenders. Yet, Choice either repeatedly failed to heed the call or repeatedly failed to execute their own policies. Instead, they continue to facilitate these crimes at their hotels, content to direct their efforts solely to profit and the bottom line.

**B. CHOICE CONTROLS THEIR LOCAL BRAND HOTELS**

62. Hotel brands or flags, including Choice, lend their name and likeness to third party owners, while a franchisee or third party management company under the brands'

---

[15] DEPARTMENT OF HOMELAND SECURITY, *Blue Campaign Toolkit*, attached as "Exhibit A." Available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

direction and control runs the building and operations. In return, the parent brand company exchanges the high risk that is inherent in owning an asset like a hotel for the low risk associated with owning a contract or franchise agreement, and profits from room rentals.

63. The average consumer does not see this relationship. The brand hotel, including Choice, gives the property its identity. It provides signage on and in front of the building assuring customers checking into the hotel that they can expect the standards consistent with the brand hotel, including Choice. The same brand is emblazoned on everything in the hotel from the pens in the bedside tables to the staff uniforms at the front desk.

64. In addition to brand recognition, a marketing organization, hotel listings in the Global Distribution System (GDS) and other online travel agency databases, the brand hotel provides the operating hotel with access to its brand wide central reservation system, 800 number, revenue management tools, world-class loyalty programs and a website. Thus, the brand hotel, including Choice, controls booking and room reservations.[16]

65. Upon information and belief, the Quality Inn® pays around 10% of their total revenue back to Choice and is required to develop and maintain the property in accordance with Choice's brand standards as are included in the franchise agreement.

66. Upon Information and belief, per the contract or franchise agreement, Choice may enforce these brand standards through periodic inspections and even termination of the franchise agreement if the operating hotel, including the Quality Inn®, is found to be

---

[16] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (April 10, 2018) https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry/.

inadequate. The right of Choice, as the brand hotel, to enforce their brand standards is also its own responsibility.

67. At the time of the incidents alleged herein, Choice owned and controlled the Quality Inn®.

68. Choice could have terminated the Quality Inn® out of its system as delinquent but it would have been done at the expense of terminating royalty payments and room rental profits, so it was not done.

## C. CHOICE'S WILLFUL AND/OR NEGLIGENT BLINDNESS TO SEX TRAFFICKING AT THEIR BRAND HOTELS

69. Choice has been on notice of repeated incidences of sex trafficking occurring at their Quality Inn®, yet Choice failed to take the necessary action to prevent sex trafficking and still persist in failing to take the necessary action to prevent sex trafficking at their hotels.

70. Choice Hotels International, Inc.:

    a. Choice owns, supervises, or operates the Quality Inn® Fort Jackson Maingate located at 7251 Garners Ferry Road, Columbia, South Carolina 29209.

    b. Choice failed to implement and enforce any of its own policy or policies and protect Plaintiff from being sex trafficked.

    c. Choice knew, or should have known, that the Quality Inn® was an area known for high incidence of crime and prone to sex trafficking activity on and around the hotels' premises, including when Plaintiff was trafficked.

    d. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Choice has repeatedly failed to take reasonable

measures to prevent or thwart human trafficking for commercial sex at its hotels.

e.  Choice may exercise control over Quality Inn$_®$ hotels by:

1.  distributing information to assist employees in identifying human trafficking for commercial sex;

2.  providing a process for escalating human trafficking for commercial sex concerns within the organization;

3.  requiring employees to attend training related to human trafficking for commercial sex;

4.  providing new hire orientation on human rights and corporate responsibility;

5.  providing training and education to Quality Inn$_®$ hotels through webinars, seminars, conferences, and online portals;

6.  developing and holding ongoing training sessions on human trafficking for commercial sex; or

7.  providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking for commercial sex prevention.

f.  Choice Hotels was in an agency relationship with Quality Inn$_®$ hotels offering public lodging services in the hotel.  This agency relationship was created through Choice's exercise of an ongoing and systemic right of control over Quality Inn$_®$ hotels by Choice's operations, including the

means and methods of how Quality Inn$_®$ hotels conduct daily business through one or more of the following actions:

1. hosting online bookings on Choice's domain;

2. requiring Quality Inn$_®$ branded hotels to use Choice's customer rewards program;

3. setting employee wages;

4. making employment decisions;

5. advertising for employment;

6. sharing profits;

7. standardized training methods for employees;

8. building and maintaining the facility in a manner specified by the owner;

9. standardized or strict rules of operation;

10. regular inspection of the facility and operation by owner;

11. fixing prices; or

12. other actions that deprive Quality Inn$_®$ branded hotels of independence in business operations.

g. An apparent agency also exists between Choice and Quality Inn$_®$ hotels. Choice held out Quality Inn$_®$ branded hotels to the public as possessing authority to act on its behalf.

h. Given Choice's public statements on behalf of its hotel brands and the dominion and control it assumed in educating, implementing, and

directing its branded hotels, including Quality Inn® branded hotels, Choice breached its duties in the following ways:

1. did not adequately distribute information to assist employees in identifying human trafficking for commercial sex;

2. failed to provide a process for escalating human trafficking for commercial sex concerns within the organization;

3. failed to mandate managers, employees, or owners attend training related to human trafficking for commercial sex;

4. failed to provide new hire orientation on human rights and corporate responsibility;

5. failed to provide training and education on human trafficking for commercial sex through webinars, seminars, conferences, and online portals;

6. failed to develop and hold or require ongoing training sessions on human trafficking for commercial sex; or

7. failed to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking for commercial sex prevention.

i. For years, Choice has failed to adequately address the rampant sex trafficking which tragically occurs throughout its Quality Inn® hotels across the country. This entrenched, pervasive willful and negligent blindness to sex trafficking facilitated the sex trafficking of Plaintiff at the Quality Inn® that forms the basis of this Complaint.

1. In September of 2016, police responded to a Quality Inn® in Oak Grove, Kentucky where a young girl was being held against her will and forced to solicit sexual acts. The hotel staff had knowledge of the sex trafficking.[17]

2. In January of 2019, two women were rescued from a Quality Inn® hotel in Battle Creek, Michigan. The men who trafficked these women forced the women to prostitute themselves through the use of drugs and physical violence. [18]

3. In March of 2018, police responded to a call at the Quality Inn® in Camarillo, California where a 51-year-old woman was found being held against her will and trafficked for commercial sex. Through a criminal investigation, authorities learned the hotel was aware of the trafficking and aided in its occurrence.[19]

4. In January of 2017, a man was arrested for trafficking a woman for the purposes of commercial sex at a Quality Inn® in Dothan, Alabama.[20]

---

[17] *Oak Grove Police sergeant, 2 others arrested during prostitution investigation*, WKRN, (Sept. 28, 2016) https://clarksvillenow.com/local/oak-grove-police-sergeant-2-others-arrested-during-prostitution-investigation/.

[18] Trace Christenson, *2 Lansing Men Arrested in Battle Creek on Human Trafficking Charges*, BATTLE CREEK ENQUIRER,https://www.battlecreekenquirer.com/story/news/2019/01/14/lansing-battle-creek-human-trafficking-quality-inn/2570625002/.

[19] Jeremy Child, *One Arrested in Human Trafficking Attempt in Camarillo*, VC Star, https://www.vcstar.com/story/news/local/communities/camarillo/2018/04/05/one-arrested-human-trafficking-attempt-camarillo/492228002/.

[20] Lance Griffin, *Website, Hotel, Assailant All Being Sued As A Result of Dothan Sex Trafficking Case*, DOTHAN EAGLE,https://www.dothaneagle.com/news/crime_court/website-hotel-assailant-all-being-sued-as-a-result-of/article_eef1d91c-e3fd-11e6-a872-1bdefa8794b3.html.

5. In January of 2017, two trafficked women were rescued during a police sting at a Quality Inn® in Stroudsburg, Pennsylvania. The women told detectives they feared for their life as they were physically abused and threatened by the man who forced them to solicit sex through backpage.com.[21]

6. In February of 2015, a 17 year-old girl was being held, drugged and used as a sex servant at a Quality Inn® in Raynham, Massachusetts.[22]

7. In May of 2017, a man targeted and recruited heroin addicts to have commercial sex with strangers to pay off their drug debts at a Quality Inn® in Jacksonville, Florida. Their services were advertised on bulletin board websites and physical abuse was used against the women as a way to keep them in the trafficker's possession.[23]

8. In April of 2018, a man was arrested for sex trafficking at a Quality Inn® in Woodbridge, Virginia.[24]

9. In July of 2013, a man and a woman recruited and harbored a 16 year-old girl for the purpose of commercial sex at a Quality Inn® in

---

[21] Manuel Gamiz, *Two Sex Workers Rescued; Alleged Pimps and Johns Arrested in Poconos Sting*, THE MORNING CALL, http://www.mcall.com/news/breaking/mc-poconos-sex-sting-trafficking-arrests-20170117-story.html.

[22] Marc Larocque, *Police Arrest Alleged Pimp in Sex Trafficking Sting in Raynham*, WICKED LOCAL (NOV. 7, 2019) https://raynham.wickedlocal.com/article/20150212/NEWS/150218308.

[23] Garrett Pelican, Jacksonville Man, 43, *Arrested On Human Trafficking Charges, The Florida Times Union*,(NMov.7,2019) https://www.jacksonville.com/news/public-safety/2017-05-31/jacksonville-man-43-arrested-human-trafficking-charges.

[24] Hooker Patrol: Human Trafficking Arrest of Alleged Pimp Maurice Cotton Charged for Running Hookers in Quality Inn, THE CHESAPEAKE SPEAK TODAY, (Nov.7,2019), https://www.thechesapeaketoday.com/2018/04/08/hooker-patrol-human-trafficking-arrest-of-alleged-pimp-maurice-cotton-charged-for-running-hookers-in-quality-inn/.

Columbia, South Carolina. They lured her in with promises of food, clothing and a place to stay.[25]

10. In February of 2016, police officials arrested a man for human trafficking for commercial sex three adults and a minor at a Quality Inn®, in Bakersfield, California.[26]

11. In September of 2015, a trafficker was arrested, after a woman escaped from his custody. The man was found to be holding two more women captive at the Quality Inn® in North Charleston, South Carolina.[27]

12. In July of 2018, a man was arrested at a Quality Inn® in Murfreesboro, Tennessee for prostituting a 23 year-old woman he had been keeping there.[28]

13. In January of 2015, a man was arrested for the trafficking a 15 year-old out of a Quality Inn® in Miami, Florida.[29]

**D. THE SEX TRAFFICKING OF PLAINTIFF**

---

[25] Two in Columbia Netted in Nationwide Child Sex Trafficking Bust, WIS NEWS,(Nov,7,2019) https://www.wistv.com/story/22961765/two-in-columbia-netted-in-nationwide-child-sex-trafficking-bust/.

[26] BPD Arrests Man for Human Trafficking,TURNTO23, (Nov.7,2019), https://www.turnto23.com/news/local-news/bpd-arrests-man-for-human-trafficking-in-central-bakersfield.

[27] Melissa Boughton, *Nightmare of Sex Trafficking FBI: More Resources Needed to Target Trafficking Online*, THE POST AND COURIER (Nov.7,2019) https://www.postandcourier.com/news/special_reports/nightmare-of-sex-traffickingfbi-more-resources-needed-to-target-trafficking/article_1d44549d-37cb-5c3e-860e-4c318500646e.html.

[28] Prostitution Investigation Lands Two in Jail, WGNS, (Nov.7,2019), https://www.wgnsradio.com/prostitution-investigation-lands-two-in-jail-cms-46351.

[29] William Shepard, *Alleged Pimp for Runaway Teen Facing Sex* Trafficking Charge: MIAMI-DADE POLICE, NBC MIAMI,(Nov.7,2019), https://www.nbcmiami.com/news/local/Alleged-Pimp-for-Runaway-Teen-Facing-Sex-Trafficking-Charge-Miami-Dade-Police-289338451.html.

71. The facts alleged herein stem from a human trafficking for commercial sex and prostitution ring operated in Columbia, South Carolina. While victimized by her traffickers, Plaintiff was subject to repeated instances of rape, physical abuse, verbal abuse, exploitation, psychological torment, kidnapping, and false imprisonment at the Quality Inn$_{®}$ in 2013.

72. In 2013, Plaintiff met her trafficker and her trafficker took her to the Quality Inn$_{®}$ where he introduced her to two other accomplices and raped her.

73. Plaintiff's trafficker and the two accomplices demanded that Plaintiff engage in commercial sex on their behalf and for their benefit.

74. Plaintiff's trafficker kept her captive at the Quality Inn$_{®}$ for days where she was repeatedly raped and required to service paying strangers.

75. Plaintiff was able to escape her trafficker at the Quality Inn$_{®}$ while they were out running errands where she ran back to her friend's house.

76. A few days later, Plaintiff was abducted off the street by two of her traffickers who told her that she owed them $1000. The debt was calculated by the days that went by after they declared Plaintiff was owned by and worked for them, but was gone. Plaintiff was handcuffed with zip ties, blindfolded, and threatened with a gun.

77. Plaintiff was returned to the Quality Inn$_{®}$ blindfolded and forced by her traffickers to continue working for them out of the Quality Inn$_{®}$

78. Plaintiff was prohibited from speaking with staff, did not have any luggage or bags, and her traffickers had her telephone and identification.

79. Plaintiff was required to engage in commercial sex for payment with various buyers at the Quality Inn® in response to advertisements for commercial sex on www.backpage.com without her consent.

80. Plaintiff was also required to engage in commercial sex for payment with various buyers at the Quality Inn® in from the prostitution-prone track.

81. At the end of each night, Plaintiff's traffickers would take 100% of the money Plaintiff made.

82. Plaintiff's traffickers controlled her by making her dependent on crack cocaine and punishing her with physical violence every time she did not conform to their abundant rules.

83. Plaintiff was pistol whipped on multiple occasions, receiving blunt trauma to her head. The sounds from various assaults were loud enough for hotel staff and patrons to hear.

84. Plaintiff was harbored at the Quality Inn® without food or water.

85. Over three (3) weeks, Plaintiff's traffickers rented a room for Plaintiff to service buyers of commercial sex that Plaintiff met on the track and who responded to the online website posts.

86. Each man entered and exited the room at the Quality Inn® as an unannounced guest. The foot traffic at the Quality Inn® was constant, voluminous and obvious.

87. Plaintiff's traffickers frequently paid for the room one night at a time and always paid in cash.

88. When Plaintiff entered the Quality Inn®, she was blindfolded by her traffickers and, once inside the room, they would unclothe her and tie her hands and feet to the bed often allowing buyers to forcibly rape her as they wished.

89. Plaintiff suffered excruciating stomach pains during her trafficking that she believed were from either the frequent forceful penetration or being starved.

90. Upon checkout, the room was frequently left with numerous used condoms scattered across various surfaces at the end of the evening.

91. Plaintiff had prominent and visible injuries that were observed by hotel staff and patrons.

92. Plaintiff was freed from her traffickers during a law enforcement sting operation at the Quality Inn®.

93. Prior to, during, and following the incidents described herein, Choice had actual and/or constructive notice of drug dealing, prostitution, and/or general safety concerns at the Quality Inn®, including, but not limited to, video surveillance of their brand hotels, as well as oral or written complaints regarding said suspicious activity. Choice failed to take any actions to curtail these activities.

**E. CHOICE FACILITATED THE TRAFFICKING OF PLAINTIFF**

94. Choice profited from the sex trafficking of Plaintiff and knowingly or negligently aided and engaged with her trafficker in his sex trafficking venture. Choice rented rooms to Plaintiff's traffickers, when they knew, or should have known, that they were using the room to harbor Plaintiff, physically assault her, and subject her to repeated exploitation as she was forced into sexual servitude.

95. Choice knew, or should have known, that Plaintiff was being trafficked and that

Choice knowingly benefitted financially from said exploitation, because Plaintiff's traffickers frequented Choice's brand hotels.

96. Choice knew, or should have known, that Plaintiff was being trafficked because Plaintiff constantly entertained traffic to appease her traffickers' daily quotas, her traffickers would help check her in then not proceed to the room, and she was often the victim of loud altercations while seemingly never allowed to be alone. All behavior that indicated they were using Choice's brand hotels for a sex trafficking venture.

97. Choice actively participated in this illegal endeavor by knowingly or negligently providing lodging to Plaintiff's traffickers in which to harbor Plaintiff while they were trafficking her.

98. Choice profited from the sex trafficking of Plaintiff and knowingly or negligently aided and participated with Plaintiff's traffickers in their criminal venture. Choice took no action as Plaintiff repeatedly visited the hotel, often with different guests, without any luggage, avoiding all eye contact, and often displaying prominent bruising all over her person while in the constant presence of her trafficker.

99. Choice actively participated in this illegal endeavor by knowingly or negligently providing lodging to those who purchased sex from Plaintiff in which to harbor Plaintiff while she was being trafficked.

100. Choice had the opportunity to stop Plaintiff's traffickers and offenders like them from victimizing Plaintiff and others like her. Instead, Choice failed to take reasonable measures to stop sex trafficking from occurring in their hotels.

101. Choice financially benefited from the sex trafficking of Plaintiff, and other victims like her, and developed and maintained business models that attract and foster

the commercial sex market for traffickers (including buyers).

102. Choice enjoys the steady stream of income that sex traffickers bring to their airport hotels from room rentals, such as the Quality Inn®.

103. Choice financially benefits from its ongoing reputation for privacy, discretion, and the facilitation of commercial sex.

104. Choice failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation on their brand hotels.

105. Choice maintained their deficiencies to maximize profits by:

 a. Reducing the cost of training employees and managers of how to spot the signs of human trafficking for commercial sex and sexual exploitation, and what steps to take;

 b. Not refusing room rentals, or reporting guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers; and/or

 c. Lowering security costs by not having proper security measures, including, but not limited to, employing qualified security officers to actively combat human trafficking for commercial sex and sexual exploitation.

106. As a direct and proximate result of these egregious practices on the part of Choice, Plaintiff and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

## CAUSES OF ACTION

### A.  COUNT ONE – 18 U.S.C § 1595 ("TVPRA")

107.  Plaintiff J.C. incorporates each foregoing allegation.

108.  Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

109.  Choice's acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595.  Specifically, Choice had a statutory obligation not to benefit financially from a venture that they knew, or should have known, to engage in violations of 18 U.S.C. §1591(a).  At all relevant times, Choice breached this duty by participating in, and facilitating, the harboring and providing of Plaintiff for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

110.  Choice has financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade.  Moreover, Choice directly benefitted from the trafficking of Plaintiff on each occasion they received payment for rooms that she was being kept in at Choice brand hotels.  The actions, omissions, and/or commissions alleged in this pleading were the but-for and proximate cause of Plaintiff's injuries and damages.

111. Plaintiff has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Choice's brand hotels and properties in violation of 18 U.S.C. § 1591(a), including the Quality Inn®.

### B.  COUNT TWO – FACILITATION OF SEXUAL ABUSE UNDER SOUTH CAROLINA LAW

112. Plaintiff J.C. incorporates each foregoing allegation.

113. Plaintiff is a victim of criminal sexual conduct, battery, and sex trafficking as defined by S.C. Code § 16-3-652, 16-3-653, and 16-3-2020 with all qualifying conduct occurring at Choice's hotel as Choice profited.

114. Choice's acts, omissions, and commissions, taken separately and/or together, outlined above facilitated and exacerbated Plaintiff's victimization and injury.

115. At all times relevant, Choice breached their non-delegable duty to Plaintiff by facilitating the harboring and providing of Plaintiff for the purposes of commercial sex induced by force, fraud, or coercion through their acts, omissions, and commissions.

116. Plaintiff has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Choice's brand hotels and properties, including the Quality Inn®.

## PRAYER FOR RELIEF

WHEREFORE, based on the forgoing, Plaintiff seeks injunctive relief in the form of a judgment requiring Choice to institute sufficient audits, policies, rules, and requirements of their employees, agents, franchisees, contractors, and/or all others operating under their flag, logo, trademark, or advertising umbrella to insure that the actions and activities outlined above no longer occur and may not serve in the future to jeopardize the health and safety of individuals similarly situated to Plaintiff herein.

AND WHEREFORE, on the basis of the foregoing, Plaintiff requests that a jury be selected to hear this case and render a verdict for Plaintiff, and against Choice, and that the jury selected award damages to Plaintiff in an amount which will effectively prevent other similarly caused acts and adequately reflects the enormity of Choice's

wrongs and injuries to Plaintiff due to Choice's faulty conduct, including but not limited to:

a) All available compensatory damages for the described losses with respect to each cause of action;

b) past and future medical expenses, as well as the costs associated with past and future life care;

c) past and future lost wages and loss of earning capacity;

d) past and future emotional distress;

e) consequential and/or special damages;

f) all available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

g) punitive damages with respect to each cause of action;

h) reasonable and recoverable attorneys' fees;

i) costs of this action; and

j) pre-judgment and all other interest recoverable.

Further, Plaintiff requests that the Court enter judgment consistent with the jury's verdict, and prays for any other damages and equitable relief the Court or jury deems appropriate under the circumstances.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable in this civil action.

Dated: April 2, 2020

Respectfully submitted,

*/s/ Dylan Bess*
Dylan Bess (ID No. 13114)
**MORGAN & MORGAN ATLANTA PLLC**

191 Peachtree Street, Suite No. 4200
Atlanta, GA 30303
Telephone: (404) 965-1886

*Attorneys for Plaintiff, B.H.*